**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MATTHEW BROWN** | **:** | **CIVIL ACTION** |
| | **:** | |
| | **:** | |
| **v.** | **:** | **NO.  22-3441** |
| | **:** | |
| **MARK KIMSEY** | **:** | |

# MEMORANDUM
## <u>with Findings of Fact and Conclusions of Law</u>

**KEARNEY, J.**                                                    **February 10, 2023**

Truth-seeking in our adversary system of resolving disputes depends on zealous advocacy of grounded legal arguments based on facts. Facts are facts; they are not theories or hopes. Misrepresentations of facts are not permitted in court. Parties and their lawyers who present knowingly false facts to the court cannot recover in the public's courthouse.

We today address the false and true facts purporting to support a personal injury claim brought by a man who we find, after evaluating his testimony, had little idea of the nature of claims brought on his behalf by lawyers admitted in this District based on facts largely given to them but apparently not verified by a friend of the man who misrepresented herself as his wife. No one disputes a multi-vehicle car accident resulted in a rear-end accident with a car driven by the man before us. But from there many of his pleaded and sworn facts have now been shown to be admittedly false as confirmed by the man's sworn testimony before us earlier this week. The man's friend (and false wife) lied to this Court concerning the man's marital status to allow the man's friend to bring a claim for loss of consortium. They presented altered documents purporting to represent the man paid thousands of dollars in cash for chiropractic services when both he and the doctor confirm he did no such thing. He filed sworn disability forms with the United States Social

Security Administration shortly before the accident representing he is completely disabled including a substantial neck and back injury. His friend and his lawyer then filed a Complaint in this Court after almost two years of investigation for a neck and back injury now allegedly caused by the car accident.

The man sat by during depositions when his friend lied under oath. She then repeatedly invoked her Fifth Amendment right against self-incrimination when she realized the opposing lawyer uncovered her lies. The friend (purporting to be his wife) quickly dropped her false loss of consortium claims when the opposing party would not pay her for the lies and shortly before trial. Their lawyer claimed to have just discovered these facts and withdrew but only after he attempted to settle the case before Judge Lloret knowing of the lies. The opposing party now moves to dismiss arguing the man committed a fraud upon this Court.

We held a detailed evidentiary hearing including testimony from the chiropractor with the false bill and the man. The friend ignored a subpoena and did not appear. The man admitted the falsity of several allegations and otherwise confirmed he knew very little about the claims filed on his behalf. He basically seems to know the accident happened and claims a different part of his neck hurts after the accident. We have no basis to find he is incompetent. He just seemingly trusted his friend and their lawyer while they collectively lied to the Court to recover.

We enter findings of fact supporting today's Order dismissing the fraud-riddled Complaint and sworn discovery:

## I.  Findings of Fact

1.     Philadelphian Matthew Brown is a sixty-year-old man with lifelong problems affecting his eyesight, and more recent health problems affecting his back, knees, legs, and overall health.

2.      He appears to suffer from memory loss and emotional distress brought upon by his present living and economic conditions but we have no evidence of an emotional disorder, mental illness, or intellectual disability.

3.      Mr. Brown swore he and a woman named either Shirley or Sharon were married for twenty years, but the two are no longer married.

4.      Mr. Brown currently lives with a friend of his former wife from the neighborhood, Miriam Primavera, but he fears she intends to now evict him and force him to live in a tent on the street.

5.      Mr. Brown relied on Ms. Primavera to help him with his various health problems and financial issues as he is not experienced in these areas.

6.      Ms. Primavera appears to have tried to help Mr. Brown.

7.      Mr. Brown and Ms. Primavera are not and have never been married.

***The Social Security Administration finds Mr. Brown disabled before the accident.***

8.      Mr.  Brown, with Ms. Primavera's aid, applied to the Social Security Administration for disability benefits on August 16, 2019.[1]

9.      Mr. Brown swore to disabilities including degenerative disc disease, leg pain/abnormal gait, and hip pain/abnormal gait as the physical conditions affecting his ability to work.

10.      He swore medical professionals treat him for "***[s]evere neck***, shoulder, back, hip, leg, knee, ankle, and foot pain" including "[p]hysical therapy, trigger point injections, chiropractic care, and massage therapy."[2]

11.      Mr. Brown swore he stopped working on February 12, 2016 because of his disabilities.

12.     Ms. Primavera who then identified herself as Mr. Brown's "friend" also submitted a third party form to the Social Security Administration on September 1, 2019 in support of Mr. Brown's disability.[3]

13.     Ms. Primavera then swore she checks on Mr. Brown daily and he "is unable to perform physical duties in a productive capacity[,]" "[h]e is in constant pain due to scoliosis and arthritis[,]" "[h]e can't walk for long periods of time[,]" "[h]is sleep is very restless due to muscle cramps in legs [and] back pain[,]" "[h]e has overall diminished capacity[,]" "gets confused[,]" and is "easily fatigued[.]"[4]

14.     Ms. Primavera swore Mr. Brown needed assistance when dressing, wiping, and bathing.

15.     Dr. David B. Klebanoff conducted an internal medicine exam of Mr. Brown in connection with his Social Security disability claim on November 11, 2019.[5]

16.     Dr. Klebanoff summarized Mr. Brown's "lifelong" neck pain which Mr. Brown described as a "constant tension" characterized by a "pulling sensation."[6]

17.     Dr. Klebanoff reported Mr. Brown rated his neck pain as a seven out of ten, his mid-back pain as a seven out of ten, and his lower-back pain a nine out of ten.[7]

18.     Dr. Klebanoff's diagnosis included: ***neck pain*** with degenerative disc disease of cervical spine; ***back pain*** with scoliosis and right lumber radiculopathy; and right lower extremity pain.

19.     The Social Security Administration found Mr. Brown disabled a month later as of February 12, 2016 – the day he claimed he stopped working – with the primary diagnosis listed as disorders of back (discogenic and degenerative).[8]

20.     The Social Security Administration decided to pay Mr. Brown $23,010.00 in January 2020 for benefits since the February 12, 2016 disability date and continues to pay him $1,382.00 a month.[9]

**Mr. Brown is involved in a June 12, 2020 multi-car accident with Mr. Kimsey.**

21.     About five months after receiving his first disability payment from the Social Security Administration, Mr. Brown drove his nephew's car on June 12, 2020 notwithstanding his severely impaired eyesight and disabilities. Traffic came to a stop. Philadelphia police officer Mark Kimsey ran his car into the rear of Mr. Brown's nephew's car as part of a seven-vehicle car accident.[10]

22.     Mr. Brown hired the Law Office of Lee A. Ciccarelli, P.C. less than ten days after the accident to represent him in the personal injury matter arising from the multi-vehicle car accident.

23.     Counsel waited for almost two years to file Mr. Brown's case presumably to allow for a good faith investigation.

24.     Attorney Emily G. Pittenger, Esquire signed a complaint on May 27, 2022 filed in the Philadelphia Court of Common Pleas suing Mr. Kimsey with Mr. Brown asserting a negligence claim and Ms. Primavera – identifying  herself as "Miriam Brown"– claiming loss of consortium arising from the multi-vehicle car accident.[11]

25.     We have no evidence Ms. Primavera signed a retainer agreement with Lee A. Ciccarelli, P.C. or Attorney Pittenger.

26.     Mr. Kimsey removed this case to our Court on August 27, 2022.[12]

27.     Attorney Stephen J. Devine of Lee A. Ciccarelli, P.C. entered his appearance as co-counsel for Mr. Brown and Ms. Primavera less than a month later on September 12, 2022.[13]

28.     Mr. Brown and Ms. Primavera, as "husband and wife," swore to papers prepared by their attorneys at Lee A. Ciccarelli, P.C. of Mr. Brown suffering "serious and permanent physical injuries in the collision, aggravation of pre-existing conditions and serious impairment of bodily function" including but not limited to injuries to his shoulders, back, spine, neck, elbow, and wrist.[14]

29.     Mr. Brown also swore he suffers, among other things, concussion syndrome, post-traumatic headaches, and post-traumatic migraines from the accident.

30.     Mr. Brown alleges the "negligence [ ] and/or carelessness" of Mr. Kimsey is the "sole factual cause" of the accident and Mr. Brown's "resulting injuries damages and losses."[15]

31.     Mr. Brown seeks damages for, among other things, past and future medical expenses and past and future lost earnings.

32.      Ms. Primavera also sought damages for loss of consortium against Mr. Kimsey which can only be brought by married couples in Pennsylvania.[16]

33.     The parties engaged in discovery closing in December 2022 with trial set for January 17, 2023.

### Mr. Brown and Ms. Primavera lie about their marital status.

34.     Mr. Brown and Ms. Primavera swore they are "husband and wife" four separate times in their verified Complaint signed by Attorney Pittenger of Lee A. Ciccarelli, P.C.[17]

35.     Ms. Primavera testified under oath on December 7, 2022 she married Mr. Brown on May 8, 2020 in Philadelphia.[18]

36.     Mr. Brown never corrected Ms. Primavera despite sitting with her during her deposition.

37.     Mr. Brown credibly swore before us he is not, and never has been, married to Ms. Primavera and they are not husband and wife.

**Mr. Brown and Ms. Primavera lie about Mr. Brown's pre-existing conditions.**

38.     Mr. Kimsey served Mr. Brown and Ms. Primavera interrogatories asking whether the accident aggravated any of Mr. Brown's pre-existing conditions.[19]

39.     Mr. Brown and Ms. Primavera swore in response: "Prior to the accident, [Mr. Brown] was treating for right knee pain, diverticulitis, GERD, and atrial fibrillations. None of these pre-existing conditions have been aggravated by the June 12, 2020 accident."[20]

40.     Nowhere in the verified interrogatory response does Mr. Brown disclose his pre-existing neck and back injuries.

41.     Nowhere in the verified interrogatory response does Mr. Brown disclose his previous treatments for his neck and back injuries

42.     Mr. Brown also swore in his interrogatory response he worked as an independent contractor from 2018-2020 despite telling the Social Security Administration he stopped working in February 2016.[21]

43.     In his verified interrogatory response asking what damages Mr. Brown sustained as a direct result of the accident, Mr. Brown lists, among other, paying $3,956.00 from Summit Spine and Wellness for chiropractic treatment necessitated by the accident.[22]

44.     Mr. Brown declared "under the penalty of perjury that these responses are true and correct" on December 6, 2022.[23]

45.     Mr. Brown credibly testified before us he never read the interrogatories and instead relied on his counsel Attorneys Devine and Pittenger who told him the responses were true.

### *Mr. Brown and Ms. Primavera produce a forged and false medical receipt.*

46.     Mr. Kimsey requested Mr. Brown and Ms. Primavera produce "any and all bills . . . prepared by any physician . . . who has examined, evaluated and/or treated [Mr. Brown] for injuries allegedly sustained as a result of the alleged accident[.]"[24]

47.     Mr. Brown and Ms. Primavera produced various bills in response to this request including a two-page typed treatment summary receipt from Summit Spine and Wellness dated May 24, 2022.[25]

48.     The treatment summary receipt includes a typed breakdown of a treatment plan and estimated costs.

49.     The two-page document includes a handwritten note on the first page from someone initialed "J.W." indicating Mr. Brown paid $3,861 in cash to Summit Spine and Wellness.[26]

50.     The second page of the document includes another handwritten note from "J.W." stating Mr. Brown paid $95 in cash on March 8, 2022.[27]

51.     The owner of Summit Spine and Wellness, Dr. Leonard J. Roberts, wrote an undated letter in November 2022 representing "Mr. Brown was not treated and did not pay for treatment in this office aside from the $95 initial charge."[28]

52.     Dr. Leonard wrote to Attorney Pettinger about the May 24, 2022 receipt on December 14, 2022: "[Mr. Brown] did pay $95 for the evaluation and x-rays. He did not pay anything else, especially not the 3861[;]"  "I just logged into his account and those documents don't have a thing written on them other than the patient name, diagnosis order (circled) and not a thing on payment whatsoever, nothing[;]" "They picked up the documents and obviously had an agenda[.] He's trying to say he paid $3600 cash and then never treated??? C'mon[.] He's wasting

our time on this part. He had a ton going on but he didn't pay for or receive services other than initial eval and report."[29]

53.     Dr. Leonard evaluated Mr. Brown for his neck and back injuries but never treated Mr. Brown for those injuries.

54.     Mr. Brown paid the initial $95 evaluation fee to Summit Spine and Wellness by credit card.

55.     Mr. Brown never paid the $3,861 represented on the treatment summary receipt.

56.     Dr. Leonard credibly testified the handwriting on the treatment summary receipt did not come from his office.

57.     Dr. Leonard credibly testified "J.W." are the initials of Jakira Wyche, an employee who formerly worked at Summit Spine and Wellness, but she did not work at the front desk and never accepted cash from patients.

58.     Summit Spine and Wellness does not provide patients with treatment summary receipts and instead the diagnoses listed on the receipts are entered into Summit Spine and Wellness's internal computer system.

59.     But, at an unknown time, Mr. Brown requested and picked up all of his medical documents from Summit Spine and Wellness including the May 24, 2022 treatment summary receipt.

60.     Mr. Brown denied writing anything on the May 24, 2022 treatment summary receipt.

61.     Mr. Brown swore he did not recognize the handwriting on the treatment summary receipt.

62.     Mr. Brown credibly testified all the documents were in an envelope when he picked them up from Summit Spine and Wellness and he gave the unopened envelope to Ms. Primavera.

63.     Ms. Primavera gave the documents to Attorney Pettinger.

64.     Attorney Pettinger produced the forged and false document to Mr. Kimsey.

**_Mr. Brown and Ms. Primavera continue to lie under oath._**

65.     Mr. Kimsey deposed Ms. Primavera and Mr. Brown on December 7, 2022.

66.     Mr. Primavera testified first; Mr. Brown sat next to her while she testified except for a couple minutes.

67.     Ms. Primavera swore Mr. Brown had no pre-existing issues with his neck before the accident, never complained about neck pain before the accident, and never received medical treatment for his neck before the accident.[30]

68.      She described him as "a very active" and "self-sufficient" person before the accident and although he had some knee pain "[t]here was nothing that kept him from doing things that he liked to do."[31]

69.     Ms. Primavera swore Mr. Brown could tie his shoes and had no trouble wiping himself before the accident, but now struggles with those tasks.[32]

70.     Ms. Primavera invoked her Fifth Amendment right against self-incrimination when confronted with the third party form she sent to the Social Security Administration on Mr. Brown's behalf.[33]

71.     Ms. Primavera then swore she had "problem with [her] memory."[34]

72.     Mr. Brown testified after Ms. Primavera.

73.     Mr. Kimsey asked whether Mr. Brown found anything his "wife"  Ms. Primavera testified during her deposition to be untrue and Mr. Brown responded "[n]ot that I know of."[35]

74.     Mr. Brown swore he never sought medical treatment for neck pain and only had "normal pain" in his back before the multi-car accident.[36]

75.     Mr. Brown testified he did not remember requesting disability payments for problems related to his neck and back.[37]

76.     Mr. Brown also swore he had problems with his memory.[38]

77.     Attorneys Devine and Pettinger proceeded with the representation through the December 22, 2022 settlement conference with Judge Lloret.  They continued to represent Mr. Brown and Ms. Primavera despite knowing of the false statements in their pleadings and discovery.

78.     Mr. Kimsey did not wish to pay anything to resolve these claims before Judge Lloret on December 22, 2023.

***Ms. Primavera drops the consortium claim and Mr. Brown's attorneys withdraw.***

79.     Ms. Primavera – now knowing Mr. Kimsey would not pay her and trial began in a couple weeks – told Attorney Pettinger the day after the conference with Judge Lloret of "removing [herself] from making any sort of claim[.]"[39]

80.     Attorneys Pettinger and Devine moved for leave to withdraw as Mr. Brown's counsel a week later on December 30, 2022.[40]

81.     Attorneys Devine and Pettinger also represented their medical causation expert could no longer offer an opinion based on these long-known facts apparently not shared with the expert.

82.     We dismissed Ms. Primavera's loss of consortium claim on January 10, 2023 after confirming she did not want to participate in the trial.[41]

83.     We granted counsel's motion to withdraw after an extensive evidentiary hearing on January 11, 2023 and extended trial – originally scheduled for January 17, 2023 – until February 23, 2023 to give Mr. Brown time to seek substitute counsel.[42]

84.     We also addressed Mr. Brown's lack of expert opinion on causation as possibly affecting his ability to prove damages.

85.     Mr. Brown has not retained substitute counsel or an expert on causation.

***Mr. Kimsey asks we dismiss the case as a sanction.***

86.     Mr. Kimsey then moved for sanctions asking we dismiss Mr. Brown's lawsuit because of his attempt to commit a fraud on the court by relying on a forged document to manufacture false evidence of damages and lying about the extent of his pre-existing neck and back injuries.[43]

87.     We held an evidentiary hearing this week on Mr. Kimsey's Motion for sanctions to assess the credibility of the parties' respective positions on the false chiropractic care treatment summary receipt and the lies Ms. Primavera and Mr. Brown alleged in their Complaint, repeated in their verified interrogatory responses, and testified to  while under oath during their depositions regarding the extent of Mr. Brown's pre-existing neck and back injuries.[44]

88.     We evaluated the credibility of the witnesses and find Dr. Roberts credibly testified the handwritten notes indicating Mr. Brown paid $3,861 and $95 in cash on the chiropractic care summary receipt did not come from Summit Spine and Wellness.

89.     Mr. Brown credibly testified he received documents from Dr. Roberts's office in an envelope, never opened the envelope, and gave the unopened envelope to Ms. Primavera who gave it to counsel.

90.     Mr. Brown credibly testified after the car accident he experienced new nerve pain in his neck which he never experienced before the accident describing it as pressure constantly pressing on his neck.

91.     Mr. Brown admitted to having neck and back muscle pains "in his bone" before the accident but swore he never had pre-existing nerve damage in his neck.

92.     Mr. Brown testified for the first time Ms. Primavera is not his wife and the two were never married despite maintaining the two were married for more than five months since filing the Complaint.

93.     Mr. Brown admitted he never paid $3,861 to Summit Spine and Wellness.

94.     We could not assess Ms. Primavera's credibility because she did not attend the hearing despite being subpoenaed by Mr. Kimsey to attend.[45]

## II.   Conclusions of Law

95.     Our Court of Appeals instructs us to balance several factors when determining whether the "extreme" sanction of dismissal is warranted: "(1) the extent of the *party*'s personal *responsibility*; (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith*; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative sanctions*; and (6) the *meritoriousness* of the claim or defense."[46]

96.     We need not find all the *Poulis* factors satisfied to dismiss a complaint.[47]

97.     We find, after balancing the *Poulis* factors, the sanction of dismissal is warranted where a man and woman sue for damages based on alleged injuries arising from a multi-vehicle car accident but deliberately lie about their marital status in the verified Complaint to allow a loss

of consortium claim, lie about the extent and nature of pre-existing neck and back problems in the verified Complaint and interrogatory responses, continue to lie under oath when deposed about the extent and nature of the pre-existing neck and back problems, feign memory loss about pre-existing injuries despite being deemed disabled by the Social Security Administration just months before the multi-car accident with disorders of the back (discogenic and degenerative), and willfully produce a forged chiropractic care summary receipt from a medical provider in an attempt to attribute false damages to the multi-vehicle car accident.

## III.   Analysis

Mr. Kimsey asks us to dismiss Mr. Brown's remaining negligence claim with prejudice. We have the inherent power "to fashion an appropriate sanction for conduct which abuses the judicial process" but this power "must be exercised with restraint and discretion."[48] An "outright dismissal of a lawsuit" is a "particularly severe sanction, yet is within [our] discretion."[49] "Dismissal must be a sanction of last, not first, resort."[50] We find dismissal with prejudice is warranted after an extensive evidentiary hearing.

In *Poulis*, our Court of Appeals affirmed Judge Bloch's dismissal with prejudice where Mr. and Mrs. Poulis's counsel continually failed to meet deadlines imposed by Judge Bloch.[51] Unlike in *Poulis*, we are faced with a more serious misconduct — fraud and forgery. Where fraud is a factor, we "consider not only the prejudice to the litigants but also the impact on the judicial system and the threat to the integrity of the courts."[52]

We are persuaded by the reasoning of our Court of Appeals  in *In re Theokary* upholding dismissal as a sanction where a party attempted to commit a fraud on the court.[53] Mr. Theokary sued two individuals who cared for and then sold his horses claiming the sale violated the automatic stay imposed when he filed for Chapter 7 bankruptcy.[54] Mr. Theokary then placed a

fraudulent expert report in evidence valuing his horses above one million dollars based on the "physically impossible" representation the two horses would birth seven foals per year over a five year period.[55] Judge Frank found Mr. Theokary manufactured the expert report on damages "in an attempt to commit a fraud upon the court and [ ] [Mr. Theokary's] conduct warrants dismissal of [the] adversary proceeding based upon the exercise of this court's 'inherent power.'"[56] Judge Restrepo (then on our Court) and our Court of Appeals affirmed.[57]

Our Court of Appeals reasoned Mr. Theokary's "fraudulent conduct did not simply impact the tainted evidence, the damages trial, or the adversarial proceedings as a whole — it represented a direct and brazen affront to the judicial process."[58] Our Court of Appeals held dismissal warranted "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."[59]

Chief Judge Bartle confronted fraudulent claims in *In re Diet Drugs*.[60] Ms. Barnett sued a pharmaceutical company for allegedly taking a diet drug from February 1989 through June 1989 and suffering adverse health effects.[61] She attached prescription records to her complaint from Super S Pharmacy in Texas which named Dr. Millenizer as her prescribing doctor.[62] But Judge Bartle found her complaint materially false for three reasons: (1) Ms. Barnett could not have purchased the diet drug in 1989 because the pharmaceutical company did not market the drug in the United States until seven years later; (2) no one by the name of Dr. Millenizer practiced medicine in Texas; and (3) there is no Super S Pharmacy located in Texas as sworn in the complaint.[63] These "fabrications" were not limited to the complaint signed by Ms. Barnett's counsel but were repeated in other documents counsel sent to the pharmaceutical company.[64] Counsel never told the pharmaceutical company the complaint or other documents contained

material fabrications, and took no action to withdraw as counsel until after the pharmaceutical company moved to dismiss and obtain sanctions.[65]

Chief Judge Bartle considered each *Poulis* factor and found the "extreme sanction of dismissal" warranted and also granted sanctions in the form of costs and attorney's fees.[66] He found Ms. Barnett and her counsel bore personal responsibility for initiating the suit by signing the complaint based on the 1989 prescription records and continuing to pursue the "baseless" suit for over two years.[67] Judge Bartle found "[t]he deliberate fabrication" of "the very evidence on which [Ms. Barnett's] claim is based" — the prescription records, the address of the pharmacy, and the identity of the prescribing physician — "obviously willful misconduct[.]"[68] Judge Bartle admonished counsel for "clearly violat[ing] his professional duties" and engaging in "abusive litigation practices."[69] Judge Bartle also placed special emphasis on how the "manufactured claims threaten the public interest in preserving the integrity of this diet drug litigation in particular and the judicial system as a whole."[70]

Chief Judge Brann also confronted a forged document in *Stafford v. Derose*.[71] Mr. Stafford while incarcerated *pro se* sued correctional officers for alleged civil rights violations.[72] In response to the correctional officers' motion for summary judgment, Mr. Stafford opposed and filed exhibits including a handwritten statement signed by "Steve Stevens" indicating he witnessed the alleged assault and stating the officer's name tag who initiated the assault read "c/o Lucas."[73] The parties deposed Steven Stephens — no one named Steve *Stevens* had been incarcerated during the time of the alleged assault, but someone named Steve *Stephens* remained in custody — who denied ever seeing or signing the statement but admitted to witnessing the assault although he could not name the officers involved in the assault.[74] The correctional officers moved for sanctions against Mr. Stafford asking Chief Judge Brann to dismiss the complaint with prejudice or, in the alternative,

exclude Mr. Stephens as a witness.[75] Chief Judge Brann held a hearing and Mr. Stafford admitted to writing and signing the statement."[76] Mr. Stafford explained Mr. Stephens did not have pens or paper at the time, so Mr. Stephens permitted him to write and sign the statement.[77]

Chief Judge Brann balanced the *Poulis* factors and dismissed the case as a sanction.[78] Chief Judge Brann found Mr. Stafford solely responsible for submitting the forged document to the court.[79] Mr. Stafford, according to Chief Judge Brann, intended to mislead the court and found his conduct willful reasoning, "[i]t is hard to imagine a more willful act than perpetrating a fraud on the court by submitting knowingly falsified documents."[80] Chief Judge Brann considered alternative sanctions such as monetary sanctions but given Mr. Stafford's continued incarcerated status Chief Judge Brann doubted he could pay monetary sanctions.[81] Chief Judge Brann emphasized "in a case of a fraud upon the court such as this, any sanction short of dismissal may be inherently inadequate to remedy the harm to the public interest in preserving the integrity of the courts, and in deterring future misconduct on the part of other litigants."[82]

We are faced with facts distinct from those Judge Lanzillo faced in *Simmons v. Gilmore*.[83] Mr. Simmons while incarcerated *pro se* sued correctional officers and employees of the Pennsylvania Department of Corrections for civil rights violations.[84] The officers and employees moved for summary judgment arguing Mr. Simmons failed to exhaust his remedies.[85] Mr. Simmons opposed the motion and attached his grievance filings.[86] One of the filings included a "request slip" addressed to Tracey Shawley, a staff member at the facility, listing Mr. Simmons's grievances with a handwritten reply confirming "no respon[s]es by staff" followed by an indecipherable signature.[87] The officers and employees moved for dismissal as a sanction claiming Mr. Simmons forged Staff Member Shawley's response and signature.[88] Staff Member Shawley

17

swore, through an affidavit, she did not write or sign the statement.[89] Mr. Simmons denied

falsifying the document but explained he marked it up "for his own records[.]"[90]

Judge Lanzillo held an evidentiary hearing to assess the credibility of the parties'

positions.[91] Mr. Simmons again acknowledged he wrote the note and signature on the form but

maintained he did so to memorialize the fact no one responded to his grievance and not to mislead

the court.[92] Judge Lanzillo then weighed the *Poulis* factors and found dismissal not warranted but

struck the grievance form and barred Mr. Simmons from relying on it.[93] Judge Lanzillo found Mr.

Simmons solely responsible for submitting the misleading grievance form and the opposing party

suffered prejudice by spending time and energy in pursing their sanctions motion which favored

dismissal.[94] He further found Mr. Simmons confused the record, but found he acted carelessly and

not intentionally.[95] Judge Lanzillo cautioned Mr. Simmons if he engaged in these misleading

practices in the future, he would interpret them as willful acts.[96]

We consider not only the forged and false summary receipt for chiropractic care Mr. Brown

produced, but we must also consider how Mr. Brown and Ms. Primavera lied about their marital

status and failed to disclose, and then lied about, Mr. Brown's pre-existing neck and back injuries.

The United States Court of Appeals for the First Circuit, although not guided by the *Poulis*

factors, affirmed Judge Gierbolini-Ortiz's dismissal of a complaint with prejudice based on a

man's failure to disclose the extent of his pre-existing injuries in *Hull v. Municipality of San Juan*.[97]

Mr. Hull fell while walking on a city sidewalk undergoing construction and allegedly suffered a

wide range of injuries.[98] He sued the municipality, the contractor working on the sidewalk, and the

contractor's insurer for negligence, loss of income, and his wife sued separately for loss of income

(due to the need to take care of the Mr. Hull) and mental anguish.[99] During discovery, Mr. Hull

failed to reveal facts about his pre-existing injuries and treatments — including a rear-end collision

resulting in a back injury; a neck injury leading to a diagnosis of nerve injury; and a slip and fall — in response to questions seeking the information until the municipality and contractor uncovered it on their own.[100] When deposed and asked why he omitted information about these injuries and treatments, Mr. Hull responded he had not remembered any of the incidents.[101] When asked about their absence in his interrogatory responses, Mr. Hull said the municipality and the contractor failed to ask the right questions.[102]

Judge Gierbolini-Ortiz dismissed Mr. Hull's claims finding he committed fraud by clear and convincing evidence.[103] The Court of Appeals for the First Circuit affirmed and held Mr. Hull clearly engaged in a pattern of deliberate deceit during the course of discovery.[104] The Court of Appeals recognized the municipality and contractor squarely sought the information about Mr. Hull's past injuries and medical history and it is unlikely Mr. Hull would have forgotten about his injuries.[105] And "given [his] obvious self-interest to enlarge his potential damages, the inference of deliberate deceit is hard to escape."[106] The Court of Appeals emphasized "[i]t is easy enough to forget details of one's past; and possibly [Mr. Hull] did suffer some impairment in the fall affecting his memory. But the information withheld was too patent and too convenient, and the pattern of deceit and grudging concessions too marked, to excuse the misstatements and omissions as merely careless."[107]

The United States Court of Appeals for the Tenth Circuit faced facts similar to those we review today in *Freddie v. Marten Transport, Ltd*.[108] Mr. Freddie sued a driver for injuries he sustained in a car accident in 2006 including: injuries to his head, neck, and back; pain in his shoulders and extremities; and fatigue and sleep problems.[109] Mr. Freddie failed to provide the other driver with details of his pre-existing conditions and claimed he never sustained a head injury before the accident.[110] But the other driver obtained (1) police and medical records which revealed

Mr. Freddie had been involved in an undisclosed rollover accident in February 2003, and (2) a medical report from 2005 where Mr. Freddie complained of chest pain, persistent neck pain, and headaches and "recall[ed] a time when he had a fairly severe head and neck injury."[111] The other driver moved to dismiss based on the two undisclosed incidents.[112] Mr. Freddie denied any wrongdoing and explained he did not drive the car in the 2003 accident and the 2005 medical report referred to a neck injury from the 1970s.[113] But the driver then obtained medical reports from 2003 which revealed Mr. Freddie obtained chiropractic treatment for injuries he claimed were sustained in the 2003 accident.[114]

Judge Conway held two hearings — Mr. Freddie did not attend the first hearing but attended the second hearing and invoked the Fifth Amendment when asked about the previously undisclosed chiropractic treatment.[115] Judge Conway, although not guided by the *Poulis* factors, considered five similar factors: (1) the degree of actual prejudice to the other driver; (2) the amount of interference with the judicial process; (3) Mr. Freddie's culpability; (4) whether the court warned Mr. Freddie in advance dismissal of the action would be a likely sanction for non-compliance; and (5) the efficacy of lesser sanctions.[116] Judge Conway weighed the factors and found they favored dismissal.[117] He found Mr. Freddie culpable for willfully failing to disclose his chiropractic treatment.[118] Judge Conway concluded Mr. Freddie could not have forgotten his symptoms from 2003, nor could he claim without any supporting evidence his pre-existing conditions had completely resolved by the 2006 accident.[119]

The Court of Appeals for the Tenth Circuit affirmed the dismissal.[120] It reasoned "[t]he withholding of evidence 'substantially prejudices an opposing party by casting doubt on the veracity of all of the culpable party's submissions throughout litigation.'"[121] So the other driver is "forced either to attempt independent corroboration of each submission, at substantial expense of

20

time and money," or to accept the possibility all documents and statements submitted by Mr. Freddie are incomplete or inaccurate.[122] The Court of Appeals for the Tenth Circuit noted it has affirmed dismissals for similar and lesser offenses.[123]

We are today faced with three pillars of deceit: (1) Mr. Brown and Ms. Primavera lied about their marital status allowing Ms. Primavera to bring a loss of consortium claim; (2) Mr. Brown and Ms. Primavera lied about the extent and nature of Mr. Brown's pre-existing neck and back injuries; and (3) Mr. Brown and Ms. Primavera submitted a forged and false chiropractic care receipt summary. Mr. Brown also likely lied about his work history as his Complaint seeks damages for his past and future lost earnings and he swore in his verified interrogatory response he worked as an independent contractor from 2018–2020. But Mr. Brown swore in his Social Security application he stopped working on February 12, 2016.

Mr. Brown's and Ms. Primavera's deceitful conduct and forgery sought to enhance their damages since the parties squarely dispute medical causation as to whether the accident caused Mr. Brown's alleged neck and back injuries. And Ms. Primavera's loss of consortium claim could only be brought if the "couple" is married. We recognize Mr. Brown did not act alone in deceiving us and Mr. Kimsey. Ms. Primavera played a central role in the deceit and forgery. Attorneys Pettinger and Devine may also bear some responsibility by initiating the suit and signing the Complaint based on plainly obvious fraudulent facts. But Ms. Primavera dropped her loss of consortium claim and Attorneys Pettinger and Devine withdrew as counsel. We are left only with Mr. Brown who is unable to retain counsel or an expert. Mr. Brown is now left to deal with the consequences of bringing a case premised on deceit. We find this conduct warrants the extreme sanction of dismissal after carefully evaluating and balancing of all the *Poulis* factors.

### A.  Mr. Brown is personally responsible for the fraud on the Court.

We first consider whether Mr. Brown is personally responsible for lying about his marital status, omitting material information about his pre-existing injuries, and producing a forged document.[124] We cannot ignore Mr. Brown and Ms. Primavera *together* while represented by *counsel* claimed to be married and omitted information about the extent of Mr. Brown's pre-existing neck and back injuries in their verified Complaint, in their verified interrogatories responses, and while being deposed under oath. Mr. Brown and Ms. Primavera *together* verified the Complaint which described Mr. Brown and Ms. Primavera (named Miriam *Brown*) as husband and wife four separate times. Mr. Brown never attempted to correct this lie until more than five months after suing Mr. Kimsey when he finally admitted he and Ms. Primavera were never married at our evidentiary hearing on this sanctions motion. But Mr. Brown *himself* also verified the interrogatory responses which omitted information about his pre-existing back and neck injuries. And he continued to deny the extent of his pre-existing neck and back injuries during his deposition.

Mr. Brown and Ms. Primavera *together* submitted the forged chiropractic care summary receipt with the handwritten note indicating they paid $3,861 for services Mr. Brown never received. Dr. Roberts credibly testified the handwritten note did not come from his office. And Mr. Brown now admits he never paid $3,861 to Summit Spine and Wellness. Although Mr. Brown credibly testified he did not write the note and he instead gave all the documents to Ms. Primavera in an unopened envelope who produced them to counsel, they both are named in this lawsuit and bear responsibility for the document's production.

Unlike in *Stafford v. Derose*, where Chief Judge Brann found Mr. Stafford solely responsible for submitting the forged statement from an eyewitness, Mr. Brown is not solely

responsible for the conduct at issue.[125] We find our facts more similar to those in *In re Diet Drug*, where Judge Bartle found Ms. Barnett and her counsel together bore responsibility for initiating the suit based on fraudulent prescription records.[126] Together Mr. Brown, Ms. Primavera, and their counsel bear personal responsibility for initiating this lawsuit based on deceit. But Mr. Brown is now solely responsible for continuing this suit. We find this *Poulis* factor weighs in favor of dismissal.

### B.  The fraud prejudices Mr. Kimsey and poses a threat to the judicial system.

Evidence of prejudice to an adversary "bear[s] substantial weight in support of a dismissal[.]"[127] We consider "the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party." [128]  Prejudice also includes depriving the opposing party of information through non-cooperation with discovery and costs expended to force compliance with discovery.[129] When fraud is involved, we consider not only prejudice but also the impact Mr. Brown's conduct has on the judicial system and "the threat to the integrity of the courts."[130]

Mr. Brown's and Ms. Primavera's fraudulent conduct prejudiced Mr. Kimsey. Mr. Kimsey expended time and resources to verify the pleadings, discovery responses, deposition testimony, and the forged receipt.  Dr. Roberts credibly testified he also spent considerable time on this matter discussing the forged medical summary receipt with both parties, producing documents, and testifying at our evidentiary hearing despite never treating Mr. Brown.

Mr. Brown's and Ms. Primavera's fraudulent conduct also poses a threat to the integrity of the judicial system as a whole. Like Judge Bartle found in *In re Diet Drugs*, Mr. Brown's and Ms. Primavera's manufactured evidence and blatant lies "threaten the public interest in preserving the integrity of . . . the judicial system as a whole."[131] And as our Court of Appeals held in *In re*

*Theokary* "fraudulent conduct d[oes] not simply impact the tainted evidence" but it "represent[s] a direct and brazen affront to the judicial process."[132] This fraudulent conduct prejudices not just Mr. Kimsey but also our judicial system as a whole weighing heavily in favor of dismissal.

### C.  Mr. Brown engaged in a pattern of fraudulent conduct.

Mr. Brown's "problematic acts must be evaluated in light of [his] behavior over the life of the case."[133] It is evident from the record Mr. Brown, along with Ms. Primavera, engaged in a pattern of fraudulent conduct. Together they lied about their marital status in the verified Complaint up until our evidentiary hearing on this sanctions motion. They also omitted the extent of Mr. Brown's pre-existing back and neck injuries in their verified Complaint, again in the verified interrogatory responses, and again when deposed. Mr. Brown and Ms. Primavera then proceeded to produce a forged receipt claiming Mr. Brown paid over $3,861 in chiropractic services he never received. And we find inconsistencies in Mr. Brown's work history, as what he tells us in his verified Complaint in August 2022 fails to align with what he swore to the Social Security Administration in August 2019.

We are faced with facts similar to those in *Hull v. Municipality of San Juan*, where the United States Court of Appeals for the First Circuit held Mr. Hull clearly engaged in a pattern of deliberate deceit during the course of discovery.[134] Similar to *Hull*, where the opposing party sought the very information Mr. Hull omitted, Mr. Kimsey squarely sought the information about Mr. Brown's pre-existing injuries. But Mr. Brown and Ms. Primavera withheld information about Mr. Brown's pre-existing injuries related to his neck and back, which he alleged occurred solely from multi-car accident at issue. Mr. Kimsey uncovered the extent of Mr. Brown's and Ms. Primavera's deceit on his own when he reviewed Mr. Brown's Social Security disability application, Ms. Primavera's third party application, and various medical records.

When asked about his pre-existing neck and back injuries at our evidentiary hearing, Mr. Brown testified he now suffers neck and back injuries which are different than anything he experienced before the accident. Before the accident Mr. Brown felt his injuries "in his bones" and after the accident he now experiences new nerve pain in his neck. Although this may be true, Mr. Brown is not a medical expert and must disclose his relevant pre-existing injuries when asked. We also face a more egregious pattern of deliberate deceit than in *Hull* and *Freddie v. Marten Transport, Ltd.* where Judges Gierbolini-Ortiz and Conway found dismissal warranted where Mr. Hull and Mr. Freddie repeatedly failed to disclose the nature and extent of their pre-existing injuries. Mr. Brown and Ms. Primavera not only repeatedly failed to disclose the nature and extent of Mr. Brown's pre-existing injuries but also lied about their marital status and submitted a forged document in an effort to increase damages. We find this factor weighs in favor of dismissal.

### D.  Mr. Brown willfully mislead us.

We next consider whether Mr. Brown engaged in "the type of willful or contumacious behavior . . . characterized as flagrant bad faith" to determine whether dismissal is warranted.[135] "Willfulness involves intentional or self-serving behavior."[136]

It is clear Mr. Brown and Ms. Primavera willfully mislead us by lying about their marital status. Mr. Brown and Ms. Primavera did not just lie about their marital status in their Complaint but continued to act as though they were married at their depositions and up until Mr. Brown admitted at our evidentiary hearing the two were never married. Mr. Brown and Ms. Primavera both signed the verified Complaint containing Ms. Primavera's loss of consortium claim, which can only be brought by married couples in Pennsylvania.[137]

Turning to his pre-existing injuries, Mr. Brown swears the neck injuries he sustained from multi-vehicle car accident are different than the pain he experienced before the accident. And

although Mr. Brown denies lying about the extent of his pre-existing neck and back injuries, we find his pattern of decent too obvious to excuse his misstatements and omissions as careless. For example, Mr. Brown, during his deposition, swore he never sought medical treatment for neck pain and only had "normal pain" in his back before the multi-vehicle car accident. Mr. Brown testified he did not remember requesting disability for problems related to his neck and back. But less than a year before the accident, Mr. Brown applied for Social Security disability benefits writing he received treatment for "severe neck" and back pain. He also described his neck pain to Dr. Klebanoff as "lifelong" and a "constant tension" before the multi-vehicle car accident. Dr. Klebanoff performed a medical exam of Mr. Brown in November 2019 and diagnosed Mr. Brown with, among other things, neck pain with degenerative disc disease of cervical spine and back pain with scoliosis and right lumber radiculopathy.

We are guided by the Court of Appeals for the First Circuit's reasoned decision in *Hull*, affirming dismissal recognizing how unlikely it would be for Mr. Hull to forgotten about his injuries "given [his] obvious self-interest to enlarge his potential damages, the inference of deliberate deceit is hard to escape."[138] Here, it is difficult to believe Mr. Brown simply cannot remember describing his neck pain as "severe[,]" being diagnosed by Dr. Klebanoff with neck and back pain, or the reasons for being paid $23,010.00 from the Social Security Administration in disability benefits months before the multi-car accident. Although he could have suffered some memory loss, these omission seems too obvious and convenient to simply forget.

We must also consider Mr. Brown's willfulness in submitting the forged chiropractic care receipt summary. Our facts our distinguishable from those in *Simmons v. Gilmore*, where Mr. Simmons acknowledged writing the handwritten note on the grievance form he submitted to the court but swore he never intended to mislead the court.[139] Judge Lanzillo, based on Mr. Simmons's

testimony, found Mr. Simmons acted carelessly but  not intentionally so he struck the forged document and  allowed the case to proceed.[140] We are not faced with carelessness. Someone wrote the handwritten note on the chiropractic care receipt summary to mislead us and Mr. Kimsey into believing Mr. Brown paid $3,861 in cash for services never received and $95 in cash for his initial evaluation. Dr. Roberts credibly testified the handwritten note did not come from his office, Mr. Brown never paid $3,861 given he never received any treatments from Summit Spine and Wellness, and Mr. Brown only paid $95 by *credit card* for his initial evaluation. Although Mr. Brown credibly testified he did not write the note and he gave all documents to Ms. Primavera who submitted them to counsel, he also admitted he never paid $3,861 to Summit Spine and Wellness. So, someone wrote the note in an effort to manufacture false evidence of damages.

As Chief Judge Brann explained in *Stafford v. Derose*, "[i]t is hard to imagine a more willful act than perpetrating a fraud on the court by submitting knowingly falsified documents."[141] We find the fraudulent conduct willful and this factor strongly favors dismissal.

### E.  No alternative sanctions exist.

We must consider whether alternative sanctions exist before we dismiss a case.[142] Although we could impose monetary sanctions, it is unlikely Mr. Brown could pay because he has been deemed disabled since 2016 and, although it is unclear when he stopped working (either 2016 or 2020), he is currently not working. Like in *Stafford* where Chief Judge Brann found monetary sanctions would not be an effective alternative sanction because he doubted whether *pro se* Mr. Stafford could pay, given Mr. Brown's financial circumstances, monetary sanctions would not be an effective alternative to dismissal. Striking the forged chiropractic care summary receipt and allowing the case to proceed would also not be an adequate remedy, despite Judge Lanzillo finding a similar remedy adequate in *Simmons*.[143] This is because the deceit goes beyond the forged receipt

— Mr. Brown also lied about his pre-existing injuries and marital status. If this case proceeds, Mr. Kimsey would be "forced either to attempt independent corroboration of each submission, at substantial expense of time and money," or to accept the possibility all documents and statements submitted by Mr. Brown are incomplete or inaccurate.[144]

And more importantly, as Our Court of Appeals held in *In re Theokary*, dismissal is warranted "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."[145] And as Chief Judge Brann similarly reasoned in *Stafford*, "in a case of a fraud upon the court such as this, any sanction short of dismissal may be 'inherently inadequate to remedy the harm to the public interest in preserving the integrity of the courts, and in deterring future misconduct on the part of other litigants.'"[146] We find no adequate alternative sanction exists and this *Poulis* factor weighs strongly in favor of dismissal.

### F.  Mr. Brown's liability claim has merit but not his damages theory.

We last consider whether Mr. Brown's remaining negligence claim has merit. "A claim . . . will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff[.]"[147] We do not use the summary judgment standard.[148]

Mr. Brown sues Mr. Kimsey for negligence stemming from Mr. Kimsey rear-ending Mr. Brown in the multi-vehicle car accident injuring Mr. Brown. The parties do not dispute the multi-vehicle car accident occurred. But Mr. Brown's and Ms. Primavera's fraudulent conduct goes directly to the issue of whether Mr. Brown's alleged neck and back injuries were caused by the multi-car accident or whether those injuries existed before the June 12, 2020 accident. Mr. Brown also claims to have suffered other injuries unrelated to his back and neck including injuries to his shoulders, elbow, and wrists along with concussion syndrome, post-traumatic headaches, and post-

traumatic migraines. So, Mr. Brown's claims have some merit even if we exclude his alleged neck and back injuries.

But Mr. Brown does not have an expert to opine on causation which would affect his ability to prove his damages. And as Chief Judge Brann highlighted in *Stafford*, we cannot ignore Mr. Brown's attempt to fabricate his damages by omitting his pre-exiting neck and back injuries and forging a chiropractic care recipient "to mislead and improperly influence the judicial system's ability to adjudicate the matter."[149] So, although his liability case may have some merit, this factor still weighs in favor of dismissal.

## IV.   Conclusion

We find each *Poulis* factor mandates dismissal. Mr. Brown and his friend sued for damages based on injuries arising from a multi-vehicle car accident but deliberately lied about their marital status in their verified Complaint. They also lied about the extent and nature of his pre-existing neck and back problems in their verified Complaint and interrogatory responses, and continued to lie under oath when deposed about the extent and nature of Mr. Brown's pre-existing neck and back problems. They then feigned memory loss about Mr. Brown's pre-existing injuries despite being deemed disabled by the Social Security Administration months before the multi-car accident with disorders of the back (discogenic and degenerative), and willfully produced a forged and false chiropractic care summary receipt from a medical provider to attribute false damages from his pre-existing neck and back problems to the multi-car accident. We grant Mr. Kimsey's motion for sanctions and dismiss Mr. Brown's Complaint with prejudice.

---

[1] ECF Doc. No. 46-4.

[2] *Id.* at 7 (emphasis added). The Social Security Administration, through Social Security Form 3368, informs the applicant: "The information you give us on this report will be used by the office that makes the disability decision on your disability claim. Completing this report accurately and

completely will help us expedite your claim. Please complete as much of the report as you can." *See* Form SSA-3368 (available at https://www.ssa.gov/forms/ssa-3368-bk.pdf). Before applying for benefits, the Social Security Administration requires the applicant to acknowledge: "any person who knowingly and willfully tries to obtain Social Security benefits falsely could be punished by a fine or imprisonment, or both." *See Apply for Benefits*, U.S. Social Security Administration, https://secure.ssa.gov/iClaim/dib (last visited Feb. 9, 2023).

[3] ECF Doc. No. 46-5.

[4] *Id*. at 2–3, 6–7. The Social Security Administration, through Social Security Form 3368, informs the applicant: "Furnishing us this information is voluntary. However, failing to provide all or part of the information may prevent an accurate and timely decision on any claim filed." *See* Form SSA-3380 (available at https://www.ssa.gov/forms/ssa-3380.pdf).

[5] ECF Doc. No. 46-6.

[6] *Id*. at 2.

[7] *Id*.

[8] ECF Doc. No. 46-2.

[9] ECF Doc. No. 46-3.

[10] ECF Doc. No. 1-1.

[11] *Id*.

[12] ECF Doc. No. 1.

[13] ECF Doc. No. 6.

[14] ECF Doc. No. 1-1 ¶ 15. Mr. Brown alleged injuries including left shoulder rotator cuff tendinosis and partial thickness supraspinatus tearing, left shoulder acromioclavicular joint hypertrophy with post-traumatic aggravation and exacerbation, left shoulder adhesive capsulitis, left shoulder pain, left shoulder region pain, left shoulder labral tearing, bilateral shoulder pain, bilateral shoulder sprain, bilateral shoulder impingement syndrome and subacromial bursitis, right shoulder pain, cervical spine posterior disc bulging at C2-3, C3-4, C4-5, C5-6, C6-7, cervical spine C5-6 central disc protrusion, cervical spine C6-7 eccentric left disc protrusion, cervical spine sprain and strain with exacerbation of multilevel cervical discogenic degenerative disease/stenosis, cervical spine multilevel foraminal narrowing, cervical spine facet hypertrophy, cervical radiculitis, cervical radiculopathy, cervical spinal stenosis, cervical spondylosis without myelopathy, aggravation of cervical spondylosis, cervicalgia, multiple traumatic disc herniations, herniated disc syndrome neck pain, upper back pain, concussion syndrome, post-traumatic headaches, post-traumatic migraines, cephalgia, occipital neuralgia, occipital never neuralgia, lumbar facet syndrome, lumbar radiculopathy, SI dysfunction, osteoarthritis with post-traumatic aggravation and exacerbation, bilateral writs and elbow sprains, bilateral writs, and elbow strain. *Id.*

[15] *Id.* ¶ 11.

[16] *See Cleveland v. Johns-Manville Corp.,* 690 A.2d 1146, 1149 (Pa. 1997) ("A claim for loss of consortium arises from the marital relationship and is based on the loss of a spouse's services resulting from an injury.").

[17] ECF Doc. No. 1-1 at 3, 10.

[18] ECF Doc. No. 44-15 at 4–5.

[19] ECF Doc. No. 44-10 at 3 (**Q.** "If you content that the alleged accident aggravated a pre-existing condition, state: (a) The nature and extent of such pre-existing condition; (b) The date upon which you believe you recovered from symptomatology of the pre-existing conditions, prior to the accident date; (c) The name and address of the healthcare professionals who treated you for the pre-existing conditions; and (d) The date of and circumstances causing you to incur the pre-existing conditions.").

[20] *Id.*

[21] *Id.* at 4–5.

[22] *Id.* at 1.

[23] *Id.* at 9.

[24] ECF Doc. No. 44-11 at 4.

[25] ECF Doc. No. 44-12.

[26] *Id.* at 1.

[27] *Id.* at 2.

[28] ECF Doc. No. 44-13.

[29] ECF Doc. No. 44-14.

[30] ECF Doc. No. 44-15 at 9 ("**Q.** Do you know whether Matt had any pre-existing issues with his neck prior to this accident? **A.** No, he did not."); *Id.* ("**Q.** Okay. I think you're being very clear, but we're making a legal record here so . . . **A.** There was no complaints of pain in his neck, in his shoulders, in his head prior to the accident. There was no pain."); *Id.* at 10 ("**Q.** Do you know whether or not he received any medical treatment to his neck prior to this accident for any reason, are you aware? **A.** No, not, not for, no, that wasn't the area of the body where he was complaining of pain."); *Id.* at 15 ("**Q.** Everything you just explained there, is that all because of this accident that brings us here today? **A.** Yes, because before the accident there was no pain, no complaints of pain, no not being able, he was able to move, he was able to ambulate, he was able to lift, you know, do things and be very limber.").

[31] *Id.* at 11 ("**Q.** Did Matt have any problems prior to this accident performing any kind of like physical activities? **A.** No. Matt was very active, a very active person."); *Id.* at 16 ("**Q.** Did he ever have any conditions that were crippling before the accident? **A.** No, nothing like this, nothing. [He] had complaints of right knee pain, a little bit of pain here and there, but he would still get up and move around. There was nothing that kept him from doing things that he liked to do.").

[32] *Id.* at 16–17 ("**Q.** So is it your testimony he was very self-sufficient before the accident, but now he's not because of the accident? **A.** Yes, because before he could tie his shoes. He can't tie his shoes today. He cannot tie his shoes. Yeah, I would say, yes."); *Id.* at 17 ("**Q.** Did he have any trouble wiping himself before the accident? **A.** No, he did not, not at all.").

[33] *Id.* at 31–36.

[34] *Id.* at 40.

[35] ECF Doc. No. 44-17 at 5 ("**Q.** You were in the room for at least 90 percent of the time I could see you, so during the 90 percent of the time that you were sitting side by side with your wife did you hear her say anything that's not true? **A.** Not that I know of.").

[36] *Id.* at 10 ("**Q.** Did you ever have any pain in your neck that would cause you to get medical treatment prior to the accident? **A.** Not that I – no, not that I recall of any kind."); *Id.* at 42 ("**Q.** Did you ever have any kind of back pain prior to this accident? **A.** Only normal pain, nothing that I went to a doctor for or complained about or had any surgery because just normal pain of being 60 years old . . .").

[37] *Id.* at 54 ("**Q.** Did your request for disability have anything to do with issues involving your neck or your back? **A.** I do not recall saying anything about those issues. They told me to write down all my medical things that I had though so after having my bill of health, these were things that I was told so they went down."); *Id.* at 58 ("**Q.** It says here again on page nine severe neck, shoulder, back, arms, hip pain, says you had x-rays of your entire spine in July of 2018. Are you saying you don't remember any of that? **A.** No, I don't remember."); *Id.* at 59–60 ("**Q.** Were you truthful to social security, to the federal government when you made your application about why you needed these disability benefits? **A.** Yes, and then I don't know, still don't know why there's neck and shoulder pain on that one. I don't recall.").

[38] *Id.* at 40 ("**Q.** Do you have memory problems or not? **A.** Yes. We're going to leave it like that.")

[39] ECF Doc. No. 44-16.

[40] ECF Doc. Nos. 18, 21.

[41] ECF Doc. No. 37.

[42] ECF Doc. No. 40.

[43] ECF Doc. No. 44.

44 *See Shulman v. Chromatex, Inc*., No. 08-229, 2010 WL 3975804, at *4 (M.D. Pa. Oct. 8, 2010) (hearing held to assess the conduct underlying the motion for sanctions); *see also Simmons v. Gilmore,* No. 17-996, 2020 WL 4016331, at *2 (W.D. Pa. July 16, 2020) (hearing held to assess the credibility of the parties' respective positions).

45 ECF Doc. No. 51.

46 *Poulis v. State Farm Fire & Cas. Co.,* 747 F.2d 863, 868 (3d Cir. 1984) (emphasis in original).

47 *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992).

48 *Chambers v. NASCO, Inc*., 501 U.S. 32, 44–45 (1991).

49 *Id.* (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765 (1980)).

50 *Poulis*, 747 F.2d at 869.

51 *Id.* at 865.

52 *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig*., 381 F. Supp. 2d 421, 425 (E.D. Pa. 2005) (quoting *Derzack v. Cnt. of Allegheny, Pa*., 173 F.R.D. 400, 414 (W.D. Pa. 1996) (internal quotations omitted)).

53 *In re Theokary,* 592 F. App'x 102 (3d Cir. 2015).

54 *Id*. at 104.

55 *Id*. at 104, n.2.

56 *Id*. at 105.

57 *Id.*

58 *Id*. at 107.

59 *Id.* (quoting *Nat'l Hockey League v. Metro. Hockey Club,* Inc., 427 U.S. 639, 643 (1976) (per curiam)).

60 *In re Diet Drugs*, 381 F. Supp. 2d at 422.

61 *Id.* at 423.

62 *Id*.

63 *Id*.

64 *Id*. at 423–24.

65 *Id*. at 424.

[66] *Id*. at 425 (internal quotation omitted).

[67] *Id*. at 426.

[68] *Id*.

[69] *Id*.

[70] *Id*. (internal quotations omitted).

[71] *Stafford v. Derose*, No. 09-346, 2015 WL 1499833, at *1 (M.D. Pa. Apr. 1, 2015).

[72] *Id*.

[73] *Id*.

[74] *Id*.

[75] *Id*. at *2.

[76] *Id*.

[77] *Id*.

[78] *Id*. at *3.

[79] *Id*. at *3–4.

[80] *Id*. at *4.

[81] *Id*.

[82] *Id*. at *5 (internal quotation and citation omitted).

[83] *Simmons*, 2020 WL 4016331, at *1.

[84] *Id*.

[85] *Id*.

[86] *Id*.

[87] *Id*.

[88] *Id*.

[89] *Id*.

[90] *Id*. at *2.

[91] *Id.*

[92] *Id.*

[93] *Id.* at *5.

[94] *Id.* at *3.

[95] *Id.* at *4.

[96] *Id.*

[97] *Hull v. Municipality of San Juan*, 356 F.3d 98, 103 (1st Cir. 2004).

[98] *Id.* at 99–100.

[99] *Id.* at 100.

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.* at 101.

[105] *Id.*

[106] *Id.*

[107] *Id.* at 101–02. But the Court of Appeals for the First Circuit vacated the dismissal of the wife's claims and remanded to allow Judge Gierbolini-Ortiz to determine the wife's responsibility, if any, for the fraud. *Id.* at 104.

[108] *Freddie v. Marten Transp., Ltd.*, 428 F. App'x 801, 802 (10th Cir. 2011).

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.* at 803.

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.* at 804.

[121] *Id.* (internal citation omitted).

[122] *Id.* (internal citation omitted).

[123] *Id.*

[124] *Adams v. Trustees of New Jersey Brewery Employees' Pension Tr. Fund*, 29 F.3d 863, 873 (3d Cir. 1994) ("[I]n determining whether dismissal is appropriate, we look to whether the party bears personal responsibility for the action or inaction which led to the dismissal.").

[125] Fed. R. Civ. P. 11(b)(3) ("By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]").

[126] *In re Diet Drugs*, 381 F. Supp. 2d at 426.

[127] *Adams*, 29 F.3d at 873–74.

[128] *Id.* at 874 (internal citations omitted).

[129] *Id.* (internal citations omitted).

[130] *In re Diet Drugs*, 381 F. Supp. 2d at 425 (quoting *Derzack*, 173 F.R.D. at 414 (internal quotations omitted)).

[131] *Id.* at 426 (internal quotations omitted).

[132] *In re Theokary,* 592 F. App'x at 107.

[133] *Adams*, 29 F.3d at 875.

[134] *Hull*, 356 F.3d at 101.

[135] *Adams,* 29 F.3d at 875 (internal citation omitted).

[136] *Id.*

[137] *See Cleveland,* 690 A.2d at 1149.

[138] *Hull*, 356 F.3d at 101.

[139] *Simmons*, 2020 WL 4016331, at *2.

[140] *Id.* at *5.

[141] *Stafford*, 2015 WL 1499833, at *4.

[142] *Poulis*, 747 F.2d at 869.

[143] *Simmons*, 2020 WL 4016331, at *5.

[144] *Freddie*, 428 F. App'x at 804.

[145] *In re Theokary,* 592 F. App'x at 107 (quoting *Nat'l Hockey League*, 427 U.S. at 643 (per curiam)).

[146] *Stafford*, 2015 WL 1499833, at *5 (quoting *Derzack*, 173 F.R.D. at 417).

[147] *Poulis*, 747 F.2d at 869–70.

[148] *Id.* at 870.

[149] *Stafford*, 2015 WL 1499833, at *5.